RECEIVED
IN LAKE CHARLES, LA

AUG 15 2011

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **RICHARD TOERNER** | : | **DOCKET NO. 2:11 CV1302** |
| VS. | : | JUDGE MINALDI |
| **CAMERON PARISH POLICE JURY** | : | MAGISTRATE JUDGE KAY |

### OPINION

In this case, the plaintiff, Richard Toerner, a former and potential candidate for Police Juror, contends that the Cameron Parish Police Jury violated the Equal Protection Clause of the 14th Amendment through the drawing of districts for parish elections.

Cameron Parish is, to say the least, unique. It is located in the southwestern corner of Louisiana. Bordered by the Gulf of Mexico to the south, the state of Texas to the west, Vermilion Parish to the east, and Calcasieu Parish and Jefferson Davis Parish to the north, it is the geographically largest parish in Louisiana. Geographically, it spans 1,932 square miles. Yet, it is the least populated parish in the state.

Its proximity to the Gulf renders Cameron Parish well-suited to be the victim of a hurricane. Since 2005, for example, two major hurricanes have devastated Cameron Parish. First in 2005, Hurricane Rita leveled the parish. It destroyed homes and business and left residents homeless and the entire parish without power for months.

Just three years later, an arguably more devastating storm, Hurricane Ike, destroyed Cameron Parish again. Like Hurricane Rita, Hurricane Ike left the majority of Cameron residents homeless and without power and other necessary services for months. To this day, Cameron Parish is still recovering from Hurricanes Rita and Ike.

1

Other factors, not just devastation, make Cameron Parish unique too. Roughly one-third of the area making up Cameron Parish is water, and a significant portion is marsh, which renders travel through the parish particularly difficult. Outside of the marsh, there are three major lakes and one major river. The Sabine Lake straddles the Texas-Louisiana border on the western edge of Cameron Parish; Grand Lake sits in the eastern portion of Cameron Parish, just southwest of Klondike; Calcasieu Lake (commonly referred to as "Big Lake") sits in the middle of Cameron Parish. Running north to south through and adjacent to the Calcasieu Lake is the Calcasieu River, which cuts Cameron Parish in half.

There is no bridge over the Calcasieu River within Cameron Parish; there is only a ferry. If the ferry is not operational, the approximately 30 mile trip from the community of Johnson Bayou to the community of Cameron, which is just south of Big Lake and east of the Calcasieu River, turns into a 4 hour and 42 minute trek over 218 miles through a neighboring parish.

The difficulties created by the parish's geography do not end there. There are many other lakes, rivers, waterways, and bayous throughout the Parish. In addition, there is a large (relative to the size of the parish) triangular island within the landlocked portion of Cameron Parish. To the south of the island is a large canal; to the east of the island is the intracoastal waterway; and to the west of the island is Big Lake. For all intents and purposes, the residents of this island are stranded when a disaster, such as a hurricane, cuts off all means of ingress and egress to and from the island. But the risk of isolation is not unique to island residents; the risk is heightened throughout Cameron Parish, largely because regular flooding cuts off a significant portion of the roads needed to travel within the parish.

Moreover, Cameron Parish can be accurately described as rural, which is, in reality, a gross understatement. It has no incorporated municipalities; meaning, there are no cities, or even towns. There are only pockets of communities scattered throughout the parish. The community

of Klondike, for instance, sits in the isolated northeast corner of Cameron Parish while the community of Johnson Bayou sits in the parish's remote and isolated southwest corner.

Because there are no incorporated municipalities, there are no mayors or city council members. There are only Police Jurors. While it is true that there are other local government officials and agencies, such as a fire district and waterworks district, which Mr. Toerner attempted to portray as independent from the Police Jury, to describe these agencies as independent from the Jury is like saying that a young child is independent from his parents. The Police Jury created those agencies, has the authority to govern those agencies (and in fact controls their funding), appoints agency officials, and is ultimately liable for their conduct. Thus, the only connection between the citizens of Cameron Parish and the local government is often Police Jurors.

A Police Juror is one of the only elected officials in Cameron Parish. His role is to provide services to the community he serves. While each township has its own tax base as well as different "wards" that include government services districts (e.g., water districts, fire districts), some of the officials governing government services districts are appointed by Police Jurors. Moreover, the Police Jury provides budgetary oversight to these various districts.

In addition, the Police Jurors who testified indicated that they address broad issues raised by concerned citizens, though they admitted that their remedial powers are limited. In fact, they receive calls from constituents "about everything," including drainage, road, and trash issues. This is an everyday occurrence. To address these issues, a Police Juror speaks with the parish administrator, who will rectify problems directly through administrative employees. Although Police Jurors do not personally fill in potholes or pick up trash, they do address problems and take deliberate action to address citizen concerns.

A Police Juror is considered a part-time job, but they describe it as a deceptively full-time position. They attend monthly board meetings. Although they are not required, they also attend their local district and ward meetings. But the major point of emphasis, and authority, of the Police Jury involves money. The Police Jury is responsible not only for allocating tax dollars but also for divvying up money dedicated to public works projects, which are often funded by the federal government through FEMA. According to the Police Jurors who testified, this represents 90 percent of Cameron Parish's budget.

Currently, there are seven Police Jurors representing seven districts, with each district generally including at least one local community. Up until 2003, there were only six Police Jurors representing six districts. In 2003, however, the Police Jury adopted and implemented a new, seven-member redistricting plan after recognizing growth in the Grand Lake area. Although unchallenged, this 2003 redistricting plan suffered from significant malapportionment.

Since 2003, however, Cameron Parish has experienced a significant demographic shift, due in large part to Hurricanes Rita and Ike. The 2010 census shows a 31.5 percent drop in population from the 2000 census population of 9,991, which results in a 2010 population estimate of 6,839. Because of this shift in population and because, according to the Police Jury, Louisiana election officials administratively interpret La. Rev. Stat. 18:1941 as requiring the receipt of a pre-cleared redistricting plan by August 29, the Police Jury prepared, adopted, and received pre-clearance of its 2011 redistricting plan from the Department of Justice. Based on the 2010 census population, the mathematical ideal for each district within the 2011 plan is 977. The 2011 reapportionment plan deviates significantly from this ideal.

The 2011 redistricting plan maintained seven member districts, but focused on respecting at least one natural boundary. It also reapportioned districts wherein there were large population

shifts while maintaining respect for pre-existing communities. This is evident both from the testimony of the jurors and the plan itself.

On the west side of the Calcasieu River are two districts – Districts 1 and 2. Within those districts, there are two communities. The largest, Hackberry, is near the northeast corner of the area of Cameron Parish that is west of the Calcasieu River. Johnson Bayou, a smaller community, is located at the opposite corner. While the redistricting plan splits Hackberry, this split is necessary based on the size of this community alone.

On the east side of the Calcasieu River are five districts. The redistricting plan focused on the community of Grand Lake, which experienced a large increase in population. The community of Grand Lake is split into three districts – Districts 3, 6, and 7. Sweet Lake then moved to District 4, where it is included with Grand Chenier and Klondike. Creole and Cameron combined to form the core of District 5.

The result is a maximum overall population deviation of 44 percent, representing the difference in population between the two districts with greatest population disparity (i.e., District 6 and District 1). Within the five districts east of the Calcasieu River, the maximum population deviation is a significant 30.7 percent (District 5 and District 6). The average population deviation for the entire redistricting plan is 14 percent.

| District | Population | Deviation |
|----------|-----------|-----------|
| 1 | 773 | -20.9% |
| 2 | 777 | -20.5% |
| 3 | 1136 | 16.3% |
| 4 | 1000 | 2.4% |
| 5 | 903 | -7.6% |
| 6 | 1203 | 23.1% |
| 7 | 1047 | 7.2% |

Mr. Toerner contends that this redistricting plan violates the Equal Protection Clause of the 14th Amendment.

5

Under the principle of "one-person, one-vote," all districts must be about the same in population size for any legislative body; anything else impermissibly dilutes the voting power of those in the more populous districts. *Gray v. Sanders*, 372 U.S. 368, 379, 381 (1963). This principle has extended beyond the federal and state representative level to all forms of local governments. In *Hadley v. Junior College District*, for example, the Court stated: "[A]s a general rule, . . . when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as practicable, that equal numbers of voters can vote for proportionately equal numbers of officials." 397 U.S. 50, 56 (1970).

Generally, only small deviations from mathematical precision are tolerated under the rule of one-person, one-vote. In *Kirkpatrick v. Preisler*, for instance, the Court declared unconstitutional the districting for the House of Representatives where the "most populous district was 3.13 percent above the mathematical ideal, and the least populous was 2.84 percent below." 394 U.S. 526, 528-29 (1969). The Court stressed that the government must "make a good-faith effort to achieve precise mathematical equality." *Id.* at 530-31.

The Court, however, has tolerated greater deviation in apportioning state legislative bodies. *Mahan v. Howell*, 410 U.S. 315, 322 (1973) ("broader latitude has been afforded the States under the Equal Protection Clause in state legislative redistricting"). "[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973). An apportionment plan with a maximum population deviation under 10 percent falls within the category of "minor deviations." *Connor v. Finch*, 431 U.S. 407, 418 (1977). But, a plan with disparities above 10 percent creates a prima facie case of discrimination and thus requires state justification. *Id.* The

Court has suggested that maximum deviations above 16.4 percent "may well approach tolerable limits." *Mahan*, 410 U.S. at 329.

Despite these ostensibly exact numerical figures, the Supreme Court has endorsed even larger deviations from equality in apportioning local legislative bodies. As the Court highlighted in *Abate v. Mundt*,

> [L]ocal legislative bodies frequently have fewer representatives than do their state and national counterparts and [] some local legislative districts may have a much smaller population than do congressional and state legislative districts, [which] lend[s] support to the argument that slightly greater percentage deviations may be tolerable for local government apportionment schemes.

403 U.S. 182, 185 (1971). The Seventh Circuit applied this rationale in upholding a county redistricting plan with an overall maximum deviation of 18.03 percent, reasoning that the "10 percent rule . . . was devised for elections in larger electoral districts." *Frank v. Forest County*, 336 F.3d 570, 573 (7th Cir. 2003) (Posner, J.).

Mathematical precision is not required. When the facts establish a prima facie case of discrimination, the government must merely justify the deviation from strict population equality. "The ultimate inquiry . . . is whether the [the government]'s plan 'may reasonably be said to advance [a] rational state policy' and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits.'" *Brown v. Thomson*, 462 U.S. 835, 843 (1983). Legitimate state interests include, (1) maintaining contiguous and compact districts; (2) sustaining core districts, communities of interests, and the overall integrity of political subdivisions; and (3) preserving natural and historical boundary lines. *Reynolds v. Sims,* 377 U.S. 533 (1964); *see Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997).

A rational state policy, however, "cannot emasculate the goal of substantial equality." *Brown*, 462 U.S. at 845. The court must consider the apportionment plan as a whole, and "consideration must be given 'to the character as well as the degree of deviations from a strict population basis.'" *Id.* A court presented with a rational justification for population disparity must balance the consistency of application and the neutrality of effect of the nonpopulation criteria with the size of the population disparities to determine whether an apportionment plan contravenes the Equal Protection Clause. *Id.*

While the burden may rest with the government if a prima facie case of discrimination is set forth, the 10 percent rule is not absolute. "[It] is merely one of prima facie liability, and is therefore rebuttable. . . and more easily so the smaller the population of the area to be redistricted, the more unevenly the population is distributed across the area, and the more numerous the districts." *Frank*, 336 F.3d at 573 (citing *Voinovich v. Quilter*, 507 U.S. 146, 161-62 (1993)). In *Frank*, for example, the Seventh Circuit analyzed the character and degree of the deviation and found the 10 percent presumption overcome in a challenge to the redistricting plan of the 21 member county board of supervisors in a large but sparsely populated county in the extreme northeast corner of Wisconsin. *Id.* at 571.

There, the challenged redistricting plan had a maximum deviation of 18 percent from the ideal of 477: the largest district had 514 residents, the smallest district had 428 residents, and the remaining districts were of "essentially uniform size." *Id.* at 572. The court emphasized that the small population of the county and the relative minor changes to the census figures needed to bring the deviation between the largest district and smallest district to 10 percent may "well be within the census-takers' margin of error." It further highlighted that three years had elapsed from the most recent census to the reapportionment challenge and explained, "during that time the movement of a few families across district lines . . . may have decisively altered the deviation

8

on which [the plaintiff] relies to show a denial of equal protection." *Id.* at 573. This significance, the court reasoned, "is also greater the smaller the population—and also the smaller the redistricted area is geographically, since people are more likely to move short than long distances." *Id.* at 574.

Finally, the court noted that the number of districts is important in assessing the constitutionality of malapportionment:

> The more districts there are, the less meaningful a comparison between just two of the districts is. If there are four districts in the electoral unit, and the largest and the smallest have very different populations, the unit itself is seriously malapportioned. If there are a hundred, the malapportionment created by two outliers is apt to be at once trivial and unavoidable.

*Id.* The court found that the twenty-one districts present in the case was a large number, and collectively held that because the county could, thought it did not, provide good reason for its action, it rebutted the prima facie case of discrimination. When the plaintiff could not come forward with evidence to sustain its burden of proof, the court upheld the plan. *Id.* ("But when the party with the burden of proof cannot obtain evidence to sustain the burden, he loses").

Here, the Police Jury recognizes that based on the 2010 census data, the population deviation represents a prima facie case of invidious discrimination. However, it provides compelling reasons for this deviation. Underlying the Police Jury's compelling justifications are questionable Census figures. Although "[t]he Census is presumptively correct and typically must be rebutted with clear and convincing evidence," *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 674 (5th Cir. 2009), "[n]o one supposes that the census is totally accurate." *Frank*, 336 F.3d at 573. "Over a larger population, mistakes of overcounting and mistakes of undercounting will tend to cancel out. . . . But this cannot be assumed in the case of a minute local population." *Id.*

9

Here, the evidence reflects inaccuracy. Voter Registration Data directly conflicts with Census figures. For example, there are more registered voters in District 5 than inhabitants of District 5. What is more, Cameron Parish had one of the worst mail-in participation levels in the state at 46 percent, leaving the remaining 54 percent of citizens to be counted by Census workers traveling door-to-door in a large, sparsely populated parish. All of this occurred at a time of incredible migration within the parish after Hurricane Ike, with some individuals taking up temporary residence outside of their actual communities. This has its strongest impact in communities within southern Cameron Parish, and it reflects a high likelihood that the Census data is inaccurate.

Although Louisiana law requires the Police Jury to use Census figures in reapportioning, there is no requirement in the United States Constitution that equal protection depends on Census estimates. Thus, the inaccuracy of the Census alone is sufficient to rebut the presumption of discrimination, and move the burden back to the plaintiff to not only prove a deviation from population equality but also to prove invidious discrimination. But, this Court need not go that far because the Police Jury provides a compelling justification for the deviation.

First, the Police Jury asserts that adherence to a natural boundary – the Calcasieu River – justifies the overall 44 percent deviation because accessibility problems of a cross-river district are significant when applied to the role of a Police Juror. Putting aside the additional burden this would place on a part-time Police Juror, who might feel compelled to attend additional district and ward meetings and run the risk of dedicating an additional four hours to the task, there is an overwhelming justification for the deviation.

A Police Juror's role is to provide services to each community they serve. If a district spans across the Calcasieu River, a Juror may be unable to adequately serve and represent his district in times of disaster since the only method of traveling over the Calcasieu River within

Cameron Parish is by means of the Cameron Ferry. As noted above, a thirty mile trip from Johnson Bayou to the community of Cameron turns into a 218 mile trek. In times of disaster, which are all too common in Cameron Parish, citizens look to their elected leaders for help and guidance, and they need to feel reassured that elected leaders will arrive and represent them in their time of need. Elected officials, likewise, must be able to assist their constituents.

It is ludicrous to assume otherwise. The world does not stop for natural disasters. Interest continues to accrue on a home note even if that home is destroyed by a thirty foot storm surge. Commerce continues to flow nationally even when those affected by a natural disaster are forced to suddenly stop and fix devastated lives. The importance of representation cannot be underestimated during these times, which is evident to this day, as some of these communities struggle just to survive.

To cure the overall maximum deviation and bring the redistricting plan within 10% of the ideal, a district *must* cross the Calcasieu River. Mr. Toerner's redistricting expert, in relevant part, described one such plan as an "intellectual exercise in 'can it be done.'" The mathematical precision required by such an intellectual exercise fails to consider the actual needs of Cameron citizens – those who the equal protection clause protects. While Mr. Toerner notes that the Cameron Ferry is operational 99 percent of the time during typical travel times, it is times of emergency that renders 99 percent effectiveness. No one contends that the ferry is fully operational after a hurricane, when representation is most needed. This Court will not burden Police Jurors and the citizens of Cameron Parish by requiring the Police Jury to reapportion at this time because a plan can fall within a couple percentage points of the ideal, and in doing so, actually cause more potential harm than good to the citizens of Cameron Parish.

Next, the Police Jury contends that the deviation within the five districts east of the Calcasieu River is justified. This deviation presents a more difficult issue. But, this Court is

assured that the deviation merely represents adherence to traditional redistricting principles and does not represent invidious discrimination. In relevant part, the redistricting plan respects communities of interest, and preserves the core of prior judicial districts. Nevertheless, the 30.7 percent maximum overall deviation between these districts may represent the highest overall deviation ever allowed, as far as this Court is aware, in an equal protection case. *See, e.g., Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (upholding overall maximum deviation of 25.7%).

Although the Supreme Court has upheld an apportionment scheme that resulted in an average deviation of 16 percent and an 89 percent maximum deviation, *Brown v. Thomson*, 462 U.S. 835 (1983), the Court in that case was confronted with a narrower issue that is not relevant to this lawsuit. In *Brown*, the Wyoming statute governing state legislative apportionment mandated that each county would have at least one representative. *Id.* Under the statutory scheme, as well as the Wyoming Constitution, the Wyoming House of Representatives was increased from 63 to 64 to accommodate Niobrara County, the state's least populous county, which had a population of less than half of mathematical ideal. As a result, Niobrara County was afforded its own representative in the Wyoming House. The plaintiffs challenged the statutory scheme. *Id.* at 843.

After the district court found the apportionment valid under the Equal Protection Clause, the plaintiffs appealed. They alleged on appeal that "[b]y granting Niobrara County a representative to which it is not statutory entitled, the voting privileges of Plaintiffs and other citizens and electors of Wyoming similarly situated have been improperly and illegally diluted in violation of the 14th Amendment. . . ." The Court upheld the apportionment plan, noting that it "presents an unusually strong example of an apportionment plan the population variations of which are entirely the result of the consistent and nondiscriminatory application of legitimate state policy." The Court went on to describe the scope of its holding:

12

> Here we are not required to decide whether Wyoming's nondiscriminatory adherence to county boundaries justifies the population deviations that exist throughout Wyoming's representative districts. Appellants deliberately have limited their challenge to the alleged dilution of their voting power resulting from the one representative given to Niobrara County. The issue therefore is not whether a 16% average deviation and an 89% maximum deviation, considering the state apportionment plan as a whole, are constitutionally permissible. Rather, the issue is whether Wyoming's policy of preserving county boundaries justifies the additional deviations from population equality resulting from the provision of representation to Niobrara County.
>
> . . . .
>
> It scarcely can be denied that in terms of actual effect on appellants' voting power, it matters little whether the 63-member or 64-member House is used. The District Court noted, for example, that the seven counties in which appellants reside will elect 28 representatives under either plan. The only difference, therefore, is whether they elect 43.75% of the legislature (28 of 64 members) or 44.44% of the legislature (28 of 63 members).... The district Court aptly described this difference as "de minimis."

*Id.* at 846-47. Thus, *Brown* does not support an 89 percent maximum deviation in equality. It merely indicates that when a court is confronted with the impact of an apportionment plan on voters, and not a challenge to the apportionment plan as a whole, it may consider factors other than population equality.

Here, in contrast to the plaintiffs in *Brown*, Mr. Toerner does not challenge the effect of increasing the number of representatives within a governmental unit. Rather, he challenges the apportionment plan as a whole. Thus, the Supreme Court's holding in *Brown* is inapplicable.

Furthermore, although the facts underlying this case are highly distinguishable from the facts in *Frank*, it is the justification that the Police Jury provides that is relevant to the issue at hand. In this case, the Police Jury provides a significant justification for the deviation while in *Frank*, the Seventh Circuit found that the defendant adequately rebutted the prima facie case of

discrimination because it could, though it did not, provide a rational justification for the 18 percent deviation.

The degree of the deviation here is significant, but a court presented with a rational justification for population disparity must nevertheless balance the consistency of application and the neutrality of effect of the nonpopulation criteria with the size of the population disparities to determine whether an apportionment plan contravenes the Equal Protection Clause. The Jury has consistently respected community boundaries and there is no evidence that any deviation from respecting these community boundaries has allowed less populated districts to increase their representation at the expense of citizens in more populated districts. *See e.g., Reynolds v. Sims*, 377 U.S. 533 (1964) (using apportionment plan to advantage rural citizens at the expense of urban citizens). In other words, the consistency of application and neutrality of effect of the rational justification for the deviation outweighs the potential harm from the size of the population disparity. This is especially true when considering the uniqueness of Cameron Parish. Accordingly, this Court finds that the apportionment plan does not contravene the Equal Protection Clause.

While Cameron's proposed plan reduces malapportionment, it is far from ideal. The court will allow the October election under this reapportionment plan as an interim measure. The newly elected Police Jury will be ordered to work with a special master appointed by this court to further reduce malapportionment. This matter will remain under this court's supervision to ensure the adoption of the fairest reapportionment plan possible.

Lake Charles, Louisiana, this ___ day of August, 2011.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

14